USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAR 2 3 2006

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

DORON PRECISION SYSTEMS, INC.,                    :

                              Plaintiff,          :          05 Civ. 7663  (PAC)

         - against -                              :          OPINION & ORDER

FAAC, INC. and NEW YORK CITY                      :
TRANSIT AUTHORITY,
                                                  :
                              Defendants.
                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff Doron Precision Systems, Inc. filed this lawsuit against FAAC, Inc., a

private company, and the New York City Transit Authority, a public transit authority, alleging

violations of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, and the Donnelly Act (New

York's antitrust law), N.Y. Gen. Bus L. § 340(1), as well as violations of a variety of New York

state laws governing competitive bidding by public entities and the proper use of public funds.

Defendants FAAC and NYCTA now move to dismiss Doron's amended complaint for failure to

state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Federal Rule 12(b)(6)").  For

the reasons set forth below, the Court grants the motions to dismiss.

## BACKGROUND

Plaintiff Doron Precision Systems, Inc. ("Doron" or "Plaintiff") is a small

company located in Binghamton, New York. (Am. Compl. ¶ 1.)  It specializes in the manufacture

and sale of electronic educational systems, such as educational television systems and driving

simulators.[1] (Id. ¶ 14.) Doron has sold computer-aided driving simulators to public transit authorities for almost eighteen years, selling the first system to Broward County Transit in June 1988.[2] (Id. ¶¶ 23-24.)

Until 1999, Doron was the only manufacturer of computer-aided bus-driving simulators for public transit agencies in the United States. (Id. ¶ 28.) Other companies, including such formidable companies as General Electric and Lockheed Martin, attempted to manufacture and sell similar products, but none of them was able to compete successfully in the marketplace, thereby leaving Doron as the only major player in the market. (Id. ¶ 27.)

In 1999, Doron lost its long-held monopoly when Defendant FAAC, Inc. ("FAAC") entered the market. Prior to 1999, FAAC, a Michigan company, specialized in manufacturing simulators primarily for truck and military applications, and had never manufactured or sold driving simulators to the bus industry. (Id. ¶¶ 29, 31.) In February 1999, however, FAAC contracted with Defendant New York City Transit Authority ("NYCTA") to convert FAAC's existing truck-driving simulator into a bus-driving simulator that rivaled Doron's product. (Id. ¶¶ 29, 30, 32.)

February 1999 Contract Between NYCTA & FAAC

On February 26, 1999, NYCTA President Lawrence G. Reuter authorized NYCTA contract No. 99B7424 (the "NYCTA-FAAC Contract" or "February 1999 Contract"),

---

[1] Driving simulation systems imitate the operation of a vehicle, for training purposes, by using a simulated vehicle cab, instructor console, system operating software, and curriculum software. (Id. ¶ 16.) According to Doron, each application of a driving simulator (i.e., bus simulator, emergency vehicle simulator, law enforcement vehicle simulator) is so unique that it constitutes a separate and distinct market, with little or no cross-elasticity of demand. (Id. ¶ 18.)

[2] For purposes of Doron's federal and state antitrust claims, Doron defines the relevant product market as: "[T]he market for computer-aided driving simulators sold to public transit agencies for the purpose of training transit bus operators." (Id. ¶ 18.)

2

which initiated a partnership between NYCTA and FAAC to develop a bus-driving simulator to train bus drivers working for urban and suburban public transit authorities nationwide. (Id. ¶ 30-33.) The contract was entered into on a sole-source basis, without a competitive bidding process, and without the approval of the NYCTA Board. (Id. ¶ 30.)

The NYCTA-FAAC Contract was structured as a profit-sharing partnership. FAAC received $200,000 from NYCTA for development of the bus simulator, a bus cab from the NYCTA fleet, and an additional $60,000 to modify the bus cab for use as a simulator. (Id. ¶¶ 34, 35.) NYCTA also agreed to purchase approximately $180,000 in hardware required to develop the simulator and to make NYCTA employees available to provide "subject matter expertise." (Id. ¶ 35.) In return, NYCTA would receive a non-exclusive license to use the simulator and up to $240,000 in royalties from FAAC's sales of the bus simulator "to offset non-recurring engineering labor funded by NYCTA in development of [the bus simulator]."[3] (Buckingham Decl., Ex. A (NYCTA-FAAC Contract, clause 9).) Royalties were to be paid to NYCTA only from sales of the FAAC bus simulator to entities other than NYCTA and its sister agencies, so NYCTA recouped its initial investment only if FAAC successfully sold its bus simulator to other public transit authorities (or private bus companies) around the country.[4] (Id.)

---

[3] FAAC was to pay royalties to NYCTA in accordance with the following schedule: (1) 4% of the product price until total royalties equal $120,000, and (2) 2% of the product price after royalties equal $120,000 until royalties equal $240,000. (Buckingham Decl., Ex. A (NYCTA-FAAC Contract, clause 9).) This $240,000 in royalties, intended to provide NYCTA some return on its initial investment, was the only "profit" that NYCTA stood to gain from development of the bus simulator.

[4] According to Doron, subsequent to entering into the contract, FAAC sold enough bus simulators to other transit agencies and municipalities to trigger its obligations to make royalty payments, but to date FAAC has not made any cash payments to NYCTA. (Am. Compl. ¶ 71.) Doron alleges that NYCTA may have exchanged some or all of its right to receive cash royalty payments for a promise from FAAC to provide enhancements and upgrades to NYCTA's products. (Id. ¶ 72.) Therefore, while the original contract contemplated a "profit-sharing partnership," it appears that NYCTA was merely a customer, which traded profits for credits towards enhancements and upgrades for which it would have

3

Numerous modifications were made to the February 1999 Contract. (Am. Compl. ¶¶ 44-56.) These modifications authorized additional payments to FAAC for the creation of the simulator, both in cash and through the provision of additional parts and software, and authorized the purchase of additional products from FAAC in connection with the project. (Id.) Later modifications also allocated NYCTA staff to assist FAAC in selling the product to other public transit authorities.[5] (Id. ¶ 56.) None of these modifications was subject to competitive bidding. (Id. ¶¶ 44-56.) While some of these modifications were approved by the NYCTA Board, Doron alleges that the Board only approved these modifications because it was misled to believe that only FAAC could meet NYCTA's needs and fulfill the contract. (Id.)

Sales of the FAAC Bus Simulator

Having completed the development work on the new simulator, FAAC and NYCTA launched a campaign to sell the simulator to other public transit authorities throughout the United States. NYCTA used its "nationwide influence and prestige in the transit industry" to endorse the product, donating its corporate logo to advertise and promote the simulator, providing potential customers with access to its resources and staff, and giving training and technical support to other public transit authorities that purchased the simulator. (Id. ¶ 80.) NYCTA does not provide similar sales, marketing and training support to Doron or its customers. (Id. ¶ 85.)

FAAC has had a great deal of success marketing and selling its bus-driving

otherwise had to pay additional sums.

    [5] Particularly, NYCTA staff would be made available to train other FAAC customers on how to use the product, to develop training curricula and driving scenarios to be used by other customers, and to participate in industry meetings on behalf of FAAC. (Id. ¶ 56.)

simulator. In fact, even though Doron's bus simulator is substantially cheaper than FAAC's simulator, FAAC has prevailed over Doron in a number of public bids. (Id. ¶ 156.) Doron alleges that this success is due not to the superiority of FAAC's product, but to the fact that FAAC and NYCTA have induced the "unsophisticated procurement officers" employed by public transit authorities to write the specifications of the FAAC simulator into their requests for proposals ("RFPs"). (Id. ¶¶ 87-89, 144, 156; Oral Argument Tr. 41, 44.) Because Doron's simulator uses vastly different technology, only FAAC can satisfy these tailored RFPs and win the contracts. (Am. Compl. ¶ 156.) According to Doron, this conduct is "deceptive" and "anticompetitive" because it induces the public transit authorities to "break their own procurement laws." (Id. ¶ 89; Oral Argument Tr. 41, 44, Dec. 9, 2005.)

        Doron provides numerous instances in which FAAC successfully procured a contract for its bus simulator as a result of tailored bid specifications. For example, on December 9, 2002, the Los Angeles County Metropolitan Transportation Authority published an RFP containing specifications that mirrored in large part the specifications of the FAAC product. (Am. Compl. ¶ 92.) Both Doron and FAAC submitted proposals in response to the RFP. (Id. ¶ 94.) Despite the fact that FAAC's simulator cost almost twice the amount of Doron's product, FAAC won the bid because its product was the only one that met all the detailed specifications contained in the RFP. (Id.) Similarly tailored RFPs have been published by the Metropolitan Suburban Bus Authority, City of Flint, Michigan, and Maryland Transit Authority, among others. (Id. ¶¶ 97-142, 149, 151, 153, 156.) In each case, FAAC won the contract because only its product could meet the specifications written into the RFP. (Id.)

5

Doron protested a number of these bids.[6] (Id. ¶¶ 96, 112, 126, 139, 140, 151, 157.) While some of these protests were successful, none of these protests has led to the sale of a Doron simulator, as the subject authorities have responded to the bid protest either by issuing a new RFP with similar, though less directly tailored, specifications, or by withdrawing the RFP altogether. (Id.) As a result, FAAC obtained 80%-90% of the market share for bus simulators from 1999 through 2002. (Id. ¶ 156.) While Doron alleges in its amended complaint that it has "failed to secure a single bid in over two years" (id. ¶ 158), and therefore Doron now has 100% of the market for computer-aided bus-driving simulators, this statement conflicts with the representations on Doron's own website, which announces that the Nashville Metropolitan Transit Authority purchased Doron's interactive bus-driving simulator in November 2005.[7] See www.doronprecision.com/press_releases/nov1_2005.html.[8]

---

[6] In addition to submitting bid protests to the proper local and state authorities in each case, Doron submitted a bid protest to the Federal Transit Administration ("FTA") challenging the Flint, Michigan RFP. On November 14, 2005, the FTA rendered a decision concluding that Flint's RFP was so specifically tailored to the FAAC simulator "it was virtually impossible for anyone other than FAAC to bid," and therefore Flint's RFP "violated the requirement for fair and open competition" that comes with the grant of federal funds. (Pl.'s Suppl. Letter Brief, Ex. 1, at 1-2.)

[7] Doron admitted to this sale during the December 9, 2005 oral argument. (Oral Argument Tr. 37.) Doron also sold an interactive bus simulator to Go Transit, the transit authority for Toronto, Canada in September 2005, a fact that Doron admitted at oral argument. In its amended complaint, however, Doron defines the relevant geographic market to include only the United States. Given the fact-intensive nature of market definition, the Court will not analyze the propriety of Doron's geographic market on a pre-discovery motion to dismiss. See discussion infra page 8-9. Therefore, the Court will not consider this sale to a Canadian agency as affecting the relevant market and each company's share in it.

[8] For purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and "it is capable of accurate and ready determination." Fed. R. Evid. 201(b); see Town of Southhold v. Town of East Hampton, 406 F. Supp. 2d 227, 232 n.2 (E.D.N.Y 2005); Sarl Louis Feraud Int'l v. Viewfinder Inc., 406 F. Supp. 2d 274, 277 (S.D.N.Y. 2005).

## DISCUSSION

Doron complains that NYCTA and FAAC violated a number of federal and state laws. First, Doron claims the February 1999 Contract violated the New York Public Authorities Law, which requires that NYCTA procure goods and services through open and competitive bidding. Second, Doron claims that the contract violated the New York Constitution's prohibition against gifts of public funds to private entities, because NYCTA gave equipment purchased with public funds to FAAC without fair compensation. Third, and most important for purposes of the Court's analysis, Doron claims that the February 1999 Contract and subsequent sales efforts violated federal and New York state antitrust laws, because they restrained trade and were intended to give FAAC a monopoly in the bus-simulator market. Because Doron's Sherman Act antitrust claims are the only causes of action arising under federal law, the Court considered only these claims when deciding Defendants' motions to dismiss.

### I. STANDARD ON A MOTION TO DISMISS

In deciding Defendants' Federal Rule 12(b)(6) motions, the Court must view the amended complaint in the light most favorable to Doron, and must accept as true all factual allegations contained therein. See Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir. 1995). Dismissal of Doron's amended complaint is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle [it] to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); accord Staron, 51 F.3d at 355. Because Doron alleges antitrust violations, the Court must be particularly cautious before dismissing Doron's amended complaint, as proof of a violation may well rest largely with the alleged conspirators. Hosp. Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 746 (1976).

7

Nevertheless, the Court need not accept as true conclusory allegations and legal conclusions masquerading as facts. In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004); accord In re Am. Express Co. S'holder Litig., 39 F.3d 395, 400 n.3 (2d Cir. 1994). An antitrust plaintiff cannot create a cause of action by pleading "conclusory allegations which merely recite the litany of antitrust." Sage Realty Corp. v. ISS Cleaning Servs. Group, Inc., 936 F. Supp. 130, 135 (S.D.N.Y. 1996) (quoting John's Insulation, Inc. v. Siska Constr. Co., 774 F. Supp. 156, 163 (S.D.N.Y. 1991)). Instead, plaintiff's complaint must adequately allege facts establishing the three required elements of an antitrust violation: (1) relevant product and geographic markets; (2) antitrust injury; and (3) conduct by defendants in restraint of trade. See id.

## II. DORON'S PRODUCT AND GEOGRAPHIC MARKETS ARE "PLAUSIBLE"

The first step in a court's analysis must be a definition of the relevant markets. The determination of what constitutes a relevant market, however, is "a 'deeply fact-intensive inquiry,' and 'courts are hesitant to grant motions to dismiss for failure to plead the relevant product market.'" N.Y. Jets LLC v. Cablevision Sys. Corp., No. 05 Civ. 2875 (HB), 2005 WL 2649330, at *5 (S.D.N.Y. Oct. 17, 2005) (quoting Todd v. Exxon Corp., 275 F.3d 191, 199-200 (2d Cir. 2001) and Creative Copier Serv. v. Xerox Corp., 344 F. Supp. 2d 858, 865 (D. Conn. 2004)); see Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 482 (1992). Therefore, to survive a motion to dismiss, a plaintiff need only allege a "plausible" market. See Todd v. Exxon, 275 F.3d at 200.

FAAC's argument that the amended complaint fails to allege proper product and

8

geographic markets is not without merit.[9] Given the "deeply fact-intensive" nature of the market

inquiry, however, the Court cannot say at this juncture, without any discovery on the commercial

realities of the bus-simulator market, that Doron's market definitions are wholly insufficient.

Accordingly, for purposes of this pre-discovery motion to dismiss, the Court assumes that

Doron's product and geographic markets are sufficiently "plausible" to withstand Defendants'

motions to dismiss.

## III. DORON HAS NOT SUFFERED ANTITRUST INJURY

A private plaintiff seeking relief under Sections 1 and 2 of the Sherman Act, 15

U.S.C. §§ 1 and 2, must establish, as a threshold matter, that it has suffered "injury of the type

the antitrust laws were intended to prevent and that flows from that which makes defendants'

acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977); see

Balaklaw v. Lovell, 14 F.3d 793, 797 (2d Cir. 1994). This requirement stems from the

fundamental precept that "the antitrust laws . . . were enacted for 'the protection of competition,

not competitors.'" Brunswick Corp., 429 U.S. at 488. Plaintiffs can recover under the antitrust

laws only if defendants' conduct is "competition-reducing." Atlantic Richfield Co. v. USA

---

[9] Defendant FAAC argues that Doron's amended complaint must be dismissed because Doron fails to allege proper product and geographic markets. (FAAC's Mem. Supp. Summ. J. 16-17.) FAAC contends that Doron's product market–the market for "computer-aided bus-driving simulators sold to public authorities"–is incorrect because other forms of driver training (e.g., test courses, safety films, driving schools) are reasonable substitutes for "computer-aided driving simulators," and therefore should be included in the relevant product market. (Id. at 16.) FAAC also contends that Doron's geographic market–the United States–is incorrect, given that Doron sells its simulators in approximately 30 countries worldwide. (Id. at 17.) While FAAC makes a strong point, its arguments only highlight the deeply fact-intensive nature of market definition. Given the unique features of computer-aided simulators, such as the ability to simulate various driving conditions without ever subjecting the trainee to the open road, it is completely plausible that computer-aided driving simulators are a separate market with little, or no, cross-elasticity of demand. Similarly, given that traffic laws and driving culture vary from country to country, it is plausible that the United States is a separate geographic market with respect to bus-simulator products.

9

Petroleum Co., 495 U.S. 328, 343-44 (1990). Therefore, to establish an "antitrust injury," a plaintiff must plead specific facts showing that "the challenged action has had an actual adverse effect on competition as a whole in the relevant market," not just on plaintiff as a competitor. Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 543 (2d Cir.), cert. denied, 510 U.S. 947 (1993).

Doron's amended complaint alleges that Defendants FAAC and NYCTA engaged in two types of anticompetitive behavior: (1) entering into the February 1999 Contract without competitive bidding or NYCTA Board approval, with the sole intent of launching FAAC into the bus-simulator market; and (2) jointly lobbying other public transit authorities to write the specifications of FAAC's bus simulator into RFPs. Doron maintains that, as a direct result of this conduct, "competitors who may have a Product that can be substituted for FAAC's Product . . . cannot prevail on a bid," as a result of which Doron has "lost RFPs" and its (100%) market share "has been eliminated." (Am. Compl. ¶ 156, 158, 163, 168.) Both Defendants argue that Doron's amended complaint must be dismissed because these allegations fail to establish antitrust injury. The Court agrees. All Doron's allegations establish is that Doron lost profits once FAAC entered the bus-simulator market. FAAC's entry into the market was pro-competitive; while FAAC's entry may have adversely impacted Doron as a competitor, it did not impact the competitive marketplace. There is no antitrust injury in these circumstances.

A. The February 1999 Contract Did Not Cause an Antitrust Injury

Prior to the February 1999 NYCTA-FAAC Contract, Doron was the only seller of bus simulators in the market. Under the February 1999 Contract, NYCTA agreed to fund the development of a bus simulator by FAAC, thereby facilitating FAAC's entry, as a manufacturer

10

and seller, into the bus-driving simulator market. Thus, the NYCTA-FAAC Contract effectively increased competition, giving consumers a new alternative in the marketplace. This is the sort of result the antitrust laws champion, not sanction. Were the Court to strike down this pro-competitive agreement as a violation of the antitrust laws, consumers would suffer, "a result that would stand antitrust law on its head." Juster Assocs. v. City of Rutland, 901 F.2d 266, 270 (2d Cir. 1990).

As the Second Circuit stated in Juster Associates v. City of Rutland, "the mere fact of increased competition and reduced profits resulting from an agreement between other parties does not constitute an antitrust injury to a plaintiff." 901 F.2d at 269 (citing R.C. Bigelow, Inc. v. Unilever N.V., 867 F.2d 102, 109 (2d Cir.), cert. denied, 493 U.S. 815 (1989)). Thus, the fact that Doron is "in a worse position than [it] would have been had the [Doron-FAAC] agreement not been executed . . . does not by itself establish an antitrust injury." Id. (internal citations and quotation marks omitted). The antitrust laws are not concerned with Doron's loss of profits at the hands of its competitor; as long Defendants' conduct did not harm consumers, there is no violation of the Sherman Act.

B. NYCTA and FAAC's Marketing Efforts Did Not Injure Market-Wide Competition

NYCTA and FAAC's later solicitation of other public transit authorities does not present an antitrust injury. Doron makes a feeble attempt at creating competitive injury by alleging that Defendants' conduct harmed "the marketplace for securing bids issued through RFPs from transit authorities." (Am. Compl. ¶ 168.) But this allegation confuses the various players in Doron's alleged product market. In the computer-aided bus-driving simulator market, the consumers are the public transit authorities looking to purchase simulators, not the sellers

11

looking to obtain bids from the public transit authorities. Thus, a valid antitrust injury would be an injury to the public transit authority consumers, whose power of choice was impaired as a result of the Defendants' conduct. Doron does not allege such an injury. Instead, Doron alleges that Defendants' joint marketing efforts injured Doron's power to bid. As long as Doron's power to bid was injured as a result of the consumer's choice, however, the federal antitrust laws do not recognize such an injury. Because Doron's amended complaint fails to allege facts demonstrating that its loss stems from an anticompetitive aspect of defendants' conduct, Defendants' motions to dismiss must be granted.

## IV. DEFENDANTS' CONDUCT WAS NOT ANTICOMPETITIVE

Assuming for a moment that Doron has alleged a valid antitrust injury, its claims would still fail because neither the February 1999 Contract nor the subsequent marketing of the FAAC simulator to other public transit authorities was anticompetitive as a matter of law. The mere existence of a contract or conspiracy does not invoke federal antitrust laws; nor does "the mere possession of monopoly power ipso facto condemn a market participant." Superturf, Inc. v. Monsanto Co., 660 F.2d 1275, 12879 (8th Cir. 1981). To survive a motion to dismiss, an antitrust plaintiff must also plead facts establishing that the defendants acted in restraint of trade, i.e., in a manner that robbed the consumer of its choice of product.[10] See 15 U.S.C. § 1; United

---

[10] Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade." 15 U.S.C. § 1. Section 2 of the Sherman Act makes illegal any monopoly, attempt to monopolize, or conspiracy to monopolize interstate trade or commerce. 15 U.S.C. § 2. Section 2 is limited, however, to monopolies attempted or obtained through "willful acquisition or maintenance" (i.e., through exclusionary means), as opposed to monopolies achieved by natural growth and the development of a superior product. See United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966). Because both Sections 1 and 2 require a similar showing of anticompetitive conduct (i.e., "a concerted attempted to reduce output and drive up prices or otherwise reduce consumer welfare," Davray, Inc. v. City of Midlothian, No. 04 Civ. 539, 2005 WL 1586574, at *13 (N.D. Tex. 2005)), the Court will analyze both claims together, rather than attempting separate (and repetitive) analyses under Section 1 and Section 2.

12

States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966). Doron alleges no such facts.

A. The NYCTA-FAAC Contract was Pro-Competitive

It is difficult to imagine how entry into a contract to develop a new bus simulator could amount to anticompetitive conduct. Through the February 1999 Contract, NYCTA partnered with FAAC to develop a new computer-aided bus-driving simulator that could compete with Doron's existing product. The amended complaint concedes that this contract created competition in a previously one-company market. After three other well-known and well-capitalized companies tried and failed, the NYCTA-FAAC venture succeeded, as a result of which there was competition in the bus-simulator market for the first time in over a decade. These facts make clear that the February 1999 Contract displaced an existing monopoly by creating a new competitor. The Court rejects Doron's argument that such a contract could restrain trade in the antitrust sense.

Doron argues that the fact that Defendants violated New York competitive bidding laws by entering into the February 1999 Contract on a sole source basis, rather than through an open bidding process, sufficiently establishes that the contract was anticompetitive in the antitrust sense. But competitive bidding laws and antitrust laws are motivated by very different policies,[11] and therefore "a violation of the letter or spirit of a competitive bid statute,

---

[11] Competitive bidding laws prescribe a series of procedural rituals (preliminary analysis, scoping sessions, interim reviews, requests for proposals, scoring of responses, etc.) intended to eliminate corruption in the awarding of public contracts. These procedures are designed to, and in fact do, minimize managerial discretion. The focus of bidding laws is solely on the lowest-cost responsible bidder; other critical factors, such as quality, timeliness, reliability, productivity and predictability are downplayed or ignored. In this sense, the public bidding process restricts competition. Many have even suggested that the public competitive bidding process adds needless cost and reduces quality. See Philip K. Howard, The Death of Common Sense. 57 passim (1994). It is significant that when state and local governments want something done well and promptly, competitive bidding is eliminated. See id.; see also New York City's and State's response to the September 11, 2001 terrorist attack. Even more significant, the public bidding process is not followed at all in the private sector. Thus, (con'd next page)

unaccompanied by anticompetitive factors bearing upon the exercise of choice of product, does not create an antitrust problem." Security Fire Door Co. v. County of Los Angeles, 484 F.2d 1028, 1031 (9th Cir. 1973). While competitive bidding statutes may "limit the freedom of public purchasers to make specific choices on the basis of preference rather than cost," the antitrust laws protect only the purchaser's freedom to make a choice in the first place. Id. As long as the consumer (here, NYCTA) chose its product, the antitrust laws were not violated. Doron's amended complaint does not allege that FAAC used "bribery, fraud or unethical procedures" that corrupted NYCTA's choice of FAAC. See Interstate Props. v. Pyramid Co. of Utica, 586 F. Supp. 1160, 1163 (S.D.N.Y. 1984) (mentioning the sorts of conduct that, if adequately alleged, might give rise to an antitrust violation). Thus, there is no reason to believe that NYCTA and FAAC's decision to enter into the February 1999 Contract and subsequent modifications was anything but freely made. Accordingly, Doron has failed to allege any violations of Sections 1 or 2 of the Sherman Act based on the February 1999 Contract.

To the extent that the NYCTA procurement violated state or local law, Doron's

_____

"competitive" bidding has nothing to do with promoting quality or choice. It is simply an anticorruption device.

The antitrust laws, on the other hand, promote "competition" for the best product, by protecting the free choice of the consumer from restrictions imposed by the seller. Thus, the policies and goals of public bidding laws and antitrust laws are completely different, in a sense even diametrically opposed–while the crux of the antitrust laws is to foster consumer choice, the public bidding laws sacrifice consumer choice to protect the public trust.

What Doron has done in this case is treat the notion of "competition" in both public bidding and antitrust laws as identical, in an attempt to establish that violation of "competition" in bidding must automatically constitute a violation of "competition" under the Sherman Act. In fact, at oral argument Doron stated: "There is an antitrust violation if there is a pattern or practice by the private company to deceptively cause [the public agencies] to break their own procurement laws." (Oral Argument Tr. 41-42.) This is simply wrong. Despite Doron's urgings to the contrary, the Court rejects the proposition that a violation of the public bidding laws constitutes a per se violation of antitrust laws.

14

proper remedy is a bid protest or a lawsuit in the New York state courts, not a federal antitrust lawsuit.

B. Defendants' Marketing Efforts Were Not Anticompetitive

The same problem plagues Doron's claim that NYCTA and FAAC violated the Sherman Act by conspiring, among themselves and with other public transit authorities, to write the specifications of the FAAC bus-simulator product into the authorities' RFPs. As the Eighth Circuit recognized in Stearns Airport Equipment Co. v. FMC Corp., "the choice of the consumer can be expressed in specifications as well as the final bid." 170 F.3d 518, 523 (8th Cir. 1999). "[T]he antitrust laws are not intended to protect profit margins, but consumer welfare," Davray, Inc. v. City of Midlothian, No. 04 Civ. 539, 2005 WL 1586574, at *14 (N.D. Tex. 2005), and a "purchaser is free to choose the product [it] desires without rendering [itself] an antitrust conspirator." Security Fire Door, 484 F.2d at 1030. True to this precept, a consumer may tailor its bid specifications to match the blueprint of a particular product, without the buyer or the seller touting its specifications running afoul of the Sherman Act, as long as all potential bidders had an equal chance, prior to drafting of the RFP, "to press for the adoption of [their] own product specifications." Superturf, 660 F.2d at 1275. Thus, NYCTA and FAAC were free to boost the FAAC simulator's specifications to potential buyers, and other public transit authorities were free to adopt them, as long as they did not engage in corrupt or fraudulent activities that robbed the public transit authorities of their independent judgment to choose whichever product it preferred.

Other courts that have reviewed antitrust claims based on similar conduct have consistently found that such conduct was not anticompetitive. In Security Fire Door Co. v. County of Los Angeles, for example, the Ninth Circuit expressly stated that tailoring bid

15

specifications does not amount to anticompetitive conduct, as long as all sellers had a chance to market their products. 484 F.2d at 1029. In that case, architects employed by Los Angeles County had prepared the specifications for a county hospital construction project so narrowly that only one seller of dumbwaiters could bid for the project. Id. at 1030. In fact, the county architects had gone so far as to write the name of plaintiff's competitor into the RFP, expressly stating, "[t]he Dumbwaiter Contractor shall provide the dumbwaiter with a Guilbert Cargomaster System," thereby excluding all competition with respect to the dumbwaiter system to be supplied for the project. Id. As a result, plaintiff, a competitor of Guilbert, could not successfully bid for the contract. Id.

Plaintiff brought a suit in federal court against Guilbert, the County of Los Angeles, and the County's architects alleging that this tailoring of specifications amounted to a conspiracy in restraint of trade in violation of Sherman Act § 1. Id. at 1030. The Ninth Circuit rejected the argument and upheld the district court's grant of the defendants' motions to dismiss for failure to state a claim. Id. at 1031. Security Fire Door makes clear that the Sherman Act's proscription against restraint on trade "seeks only to assure that the choice of product has been made freely under circumstances where the play of competition has been available." Id. at 1030. Only where "anticompetitive factors have foreclosed a free choice by the purchaser" is the Sherman Act implicated. Id. at 1030-31.

The Ninth Circuit also held that a violation of state competitive bidding laws cannot, by itself, establish a violation of the Sherman Act. In response to plaintiff's complaint that defendants had failed to comply with California laws requiring competitive bidding by municipalities, the court explained:

16

[A] violation of the letter or spirit of a competitive bid statute, unaccompanied by anticompetitive factors bearing upon the exercise of choice of product, does not create an antitrust problem. Even a direct contract for the Guilbert system, without any pretense of putting the job out to bid (and thus a clear violation of the competitive bidding statute), would not in itself have constituted a restraint of trade under the Sherman Act if the selection of Guilbert had been made in an atmosphere free from anticompetitive restraints.

Id. at 1031. Because the consumer, the County of Los Angeles, freely chose which specifications to write into the RFP, it chose its product, and therefore defendants did not violate the antitrust laws. Id. at 1030-31.

Later courts faced with Sherman Act claims–both Sections 1 and 2–based on similar conduct have consistently adopted the Security Fire Door approach. These courts have held that "the inclusion of proprietary specifications in . . . bid documents [does not] endanger the competitive process," for antitrust purposes, as long as the ultimate purchaser has a choice. Triple M Roofing Corp. v. Tremco, Inc., 753 F.2d 242, 247 (2d Cir. 1985); see also Stearns, 170 F.3d at 523 ("[I]n the municipal bidding context, permissible competition is not restricted to the bid itself but can also occur in the process of 'selling' specifications and contract forms, when companies 'tout the virtues' of their product."); Superturf, 660 F.2d 1275 (finding that the defendant monopolist's efforts to push plaintiff out of the market by aggressively marketing its specifications to customers did not violate Section 2 of the Sherman Act because plaintiff was "free to press for the adoption of its own product specifications"); Davray, 2005 WL 1586574, at *16 (adopting in full the position, expressed in prior case law, that "the inclusion of specifications [does] not hamper free competition"). Only where the plaintiff alleges bribery, fraud, or improper selling methods that robbed the ultimate purchaser of the opportunity to choose its product is the Sherman Act implicated.

17

Applying Security Fire Door and its progeny to this case, the proper inquiry is whether Doron adequately alleged that Defendants engaged in conduct that destroyed prespecification competition, thereby robbing the public transit authorities of the opportunity to choose its product. As other courts have recognized, "[t]he question is not whether the defendant's practices were unfair or tortious, but whether those practices hobbled competition." Richard Hoffman Corp. v. Integrated Bldg. Sys., 610 F. Supp. 19, 22 n.3 (N.D. Ill. 1985). Even when accepting all factual allegations in the amended complaint as true, the Court finds no such allegations.

According to the amended complaint, FAAC and NYCTA embarked on a campaign to get various public transit authorities to tailor the specifications in their RFPs to match those of FAAC's product. (Am. Compl. ¶¶ 77-153.) NYCTA assisted FAAC in its efforts by "using its nationwide influence and prestige in the transit industry," and lending its staff and training resources, to help FAAC sell its bus-driving simulator. (Id. ¶¶ 80-86.) But this conduct was simple marketing. In each case, Doron was equally free to "tout the virtues of [its simulator] in an effort to secure favorable specifications," Security Fire Door, 484 F.2d at 1031, and the public transit authority preparing the RFP was free to reject Defendants' solicitation efforts and tailor the specifications to Doron's product.

FAAC and NYCTA never had the power to tell other public transit authorities how to act or force them to buy a bus simulator (as opposed to other training options). NYCTA and FAAC could only tout the virtues of the FAAC simulator in an effort to convince the authorities to buy a bus simulator, preferably of FAAC's design and manufacture. This is pro-competitive salesmanship, not corrupt or anticompetitive conduct. The Second Circuit has made

18

clear that "[t]he antitrust laws were never intended to provide a balm for the hardships occasioned by vigorous competition," nor were they intended "to deny spoils fairly won in the marketplace." Triple M Roofing, 753 F.2d at 243, 247. To the extent that Doron lost bids as a result of Defendants' solicitation efforts, "the natural remedy would seem to be an increase in [Doron's] sales efforts on future potential bids, not an antitrust suit." Accordingly, Doron's Sherman Act claims must fail.

Doron alleges that, even if the public transit authorities chose the specifications in their RFPs, Defendants' conduct was anticompetitive because Defendants used deceptive and coercive means to achieve their goal. But the "facts" Doron alleges to support this claim are both irrational and condescending. In essence, Doron alleges that Defendants conspired with one another, and with other public transit authorities, to rig bids, so that the public transit authorities would pay higher prices for an inferior product. Perhaps recognizing that this theory makes no economic sense–as it suggests that the public transit authorities conspired with Defendants against their own economic interests–Doron alleges that "unsophisticated procurement officer[s]" were tricked into making the choices they made by Defendants' deceptive misrepresentations. (Oral Argument Tr. 40-42, 44.)

The Court cannot assume, as Doron alleges, that the public transit authorities are sheep waiting to be shorn; and that Doron must protect them from their own irrational behavior. It is not the role of this Court to judge the competence of public purchasing agents. Regardless, even if the procurement officers lacked intelligence or sophistication, the antitrust laws' applicability does not depend upon the sophistication of the consumer. As long as the consumer had a choice free from anticompetitive forces, the antitrust laws do not apply. "To the extent that

19

the [public transit authorities] lacked perfect information, [Doron] could have supplied them with the missing perspective by matching [Defendants'] sales efforts." Sterns, 170 F.3d at 527. The failure of Doron's marketing efforts cannot now give rise to a Sherman Act claim.

C. Doron has Misstated the Standard of Proof Required on a Motion to Dismiss

Doron contends that the Court must deny Defendants' motions to dismiss "because the Amended Complaint pleads a conspiracy between FAAC and NYCTA, [so] Doron has satisfied its pleading burden." (Pl.'s Mem. Supp. Summ. J. 36.) This is not an accurate statement of the law. A conspiracy alone does not create an antitrust violation. Plaintiff must also plead sufficient facts to establish that the alleged conspiracy unreasonably restrained trade. As the foregoing analysis demonstrates, Doron has not met its burden.

Doron also argues that it has satisfied its pleading burden because it alleges that NYCTA and FAAC used "deceptive" and "coercive" (and therefore "anticompetitive") practices to sell their simulator. (Id.) Doron does not plead facts establishing the allegedly "deceptive" or "coercive" practices, suggesting instead that the invocation of these words is sufficient to withstand Defendants' motions to dismiss. Again, Doron misconstrues the law. Doron cannot turn otherwise permissible conduct into anticompetitive conduct, and thereby engineer an antitrust violation, simply by applying polemic labels. While Doron uses terms like "exclusionary conduct," "deception," and "coercion," as the foregoing discussion demonstrates, Doron does not actually plead facts to support these conclusory allegations. To defeat Defendants' motion to dismiss, Doron had "to do more than plead mere 'conclusory allegations or legal conclusions masquerading as factual conclusions,'" In re Bristol-Myers Squibb, 312 F. Supp. 2d at 555 (quoting Gebhardt v. Allspect, Inc., 96 F. Supp. 2d 331, 333 (S.D.N.Y. 2000)), it

20

had to plead actual facts that, if true, would constitute an antitrust violation. Doron failed to do so.

As a last resort, Doron argues that the Court must deny Defendants' motions because the determining whether conduct was anticompetitive is a fact-intensive inquiry, and therefore a court should not dismiss a complaint on a motions to dismiss for failure to establish a restraint of trade or anticompetitive conduct. (Oral Argument Tr. 31, 32, 35-36.) Where the conduct alleged by the plaintiff fails to make out an antitrust violation as a matter of law, however, the Court must grant defendant's motion to dismiss. Absent allegations of fraud or other anticompetitive conduct that destroyed consumer choice, a violation of public bidding laws alone cannot give rise to a Sherman Antitrust action.[12] Therefore, Doron's Sherman act claims cannot survive.

## V. EVEN IF ANTICOMPETITIVE, DEFENDANTS' CONDUCT IS IMMUNE

Even if Defendants' conduct could be interpreted as anticompetitive, for purposes of this pre-discovery motion to dismiss, it would still be immune from antitrust liability due to a number of well-settled immunity doctrines.

### A. Parker Doctrine

Even if the February 1999 Contract to develop a new bus-driving simulator restrained trade,[13] the state action (or "Parker") doctrine immunizes NYCTA from antitrust

---

[12] In fact, Security Fire Door, perhaps the first case to directly hold that a violation of competitive bidding laws does not constitute a violation of the Sherman Act, dismissed plaintiff's antitrust claims on a Rule 12(b)(6) motion to dismiss. See Security Fire Door, 484 F.2d at 1029-30.

[13] For purposes of this motion to dismiss, the Court will limit applicability of the Parker doctrine to the original February 1999 Contract to develop the new simulator. The NYCTA enabling statutes gives NYCTA the authority to take all steps necessary to provide safe and efficient public transit in the

21

liability arising from that contract. In Parker v. Brown, the Supreme Court held that the Sherman

Act does not prohibit a State, as sovereign, from imposing certain anticompetitive restraints in an

attempt to displace competition with regulation. See 317 U.S. 341, 351-52 (1943). The Court

later explained that municipalities and state subdivisions (e.g., agencies and public corporations)

"do not receive all the federal deference of the States that create them." City of Lafayette v.

Louisiana Power & Light Co., 435 U.S. 389, 412 (1977 ). In order to receive Parker immunity, a

state subdivision must establish that it acted "pursuant to a clearly expressed state policy" to

displace competition. See Town of Hallie v. City of Eeau Claire, 471 U.S. 34, 40 (1985). "This

does not mean, however, that a political subdivision necessarily must be able to point to a

specific, detailed legislative authorization before it properly may assert a Parker defense to an

antitrust suit." Louisiana Power & Light, 435 U.S. at 415. The subdivision must only establish

that the state legislature intended "from the authority given [to it] to operate in [that] particular

area, that the legislature contemplated the kind of action complained of." Id.

              The state authority required for a state subdivision to receive Parker immunity is

broad. See City of Columbia v. Omni Outdoor Adver., Inc., 499 U.S. 365, 372 (1991). In a

sense, this inquiry is really about foreseeability. See id.; Cine 42nd St. Theater Corp. v.

Nederlander Org., Inc., 790 F.2d 1032, 1042, 1043 (1986). To gain Parker immunity, NYCTA

must demonstrate–either from the language of the NYCTA organic statute or its legislative

history–that the state legislature foresaw, and by subsequently passing the statute permitted, the

---

New York City metropolitan area. The Court is certain that this mandate includes the authority to enter
into contracts to develop new training products, and that this conduct was perfectly foreseeable to the
State legislature. The Court need not decide whether this mandate includes the authority to act as a
distributor or sales representative supporting FAAC's sales to other public transit authorities.

22

anticompetitive conduct. See, e.g., Omni Outdoor, 499 U.S. at 373 (finding city zoning ordinance restricting new billboards foreseeable, and therefore eligible for Parker immunity, based on state authorization to regulate "size, location, and spacing" of billboards); Town of Hallie, 471 U.S. at 42, 47 (holding monopolistic tying arrangement by City eligible for Parker immunity because such anticompetitive conduct was a "foreseeable result of empowering the City to refuse to [provide sewage services to] unannexed areas")

In the NYCTA enabling statute, the New York state legislature granted NYCTA the authority "to make and enforce contracts" and "do all things necessary or convenient to carry out" NYCTA's mandate of operating a commuter transit system in New York City. See N.Y. Pub. Auth. L. §§ 1204(11), (17), 1209(9). The legislature also authorized NYCTA to enter contracts without competitive bidding in a wide variety of circumstances, including "where the authority wishes to experiment with or test a new product or technology or evaluate the service or reliability of a new source for a particular product or component." N.Y. Pub. Auth. L. § 1209(2)(f); see also id. § 1209(9)(d) (same). Reading these provisions together, it was reasonably foreseeable to the New York legislature when it passed the NYCTA enabling statute that, if NYCTA believed it was necessary to develop a new product in order to enhance commuter transit in New York, it would forego competitive bidding and approach companies about developing the product on a sole-source basis. This is exactly what NYCTA did in this case. Desiring a new method for training its bus drivers on how to drive New York City streets, NYCTA entered into a contract with FAAC to develop a bus-driving simulator. Given the language of the NYCTA enabling statute, this action was clearly foreseeable to, and therefore clearly authorized by, the New York legislature. Accordingly, the Court finds that NYCTA's

23

decision to enter into the February 1999 Contract with FAAC falls squarely within the purview

of the Parker doctrine, rendering NYCTA immune from antitrust liability arising from this

conduct.[14]

B. Noerr-Pennington Immunity

Defendants' conduct in marketing the FAAC bus-driving simulator to other

potential customers is also immunized from federal antitrust liability by the Noerr-Pennington

doctrine. The Noerr-Pennington doctrine, which is grounded in the Petition Clause of the First

Amendment, protects the right of private entities to petition government by shielding such

lobbying activities from liability under the antitrust laws. See Eastern R.R. Presidents Conference

v. Noerr Motor Freight, 365 U.S. 127 (1961) (immunizing from antitrust liability lobbying efforts

by 24 railroads and an association of railroad presidents to obtain legislative and executive action

unfavorable to competing trucking firms); United Mine Workers v. Pennington, 381 U.S. 657

(1965) (extending Noerr-Pennington immunity to efforts to influence agency decisionmaking,

stating that "joint efforts to influence public officials do not violate the antitrust laws even

though intended to eliminate competition"). The Supreme Court has extended Noerr-Pennington

immunity to a wide range of activities in addition to traditional lobbying, including publicity

campaigns, sales and marketing efforts, and court litigation. See, e.g., Omni Outdoor, 499 U.S.

---

[14] Under existing Second Circuit precedent, the Court's conclusion that NYCTA is immune from antitrust liability under the Parker doctrine "also compels the conclusion that [FAAC] is shielded from antitrust liability," since subjecting FAAC to antitrust liability when NYCTA is immune "would effectively block [NYCTA's] efforts to carry out its mandate through contracts with private parties." Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc., 155 F.3d 59, 74 (1998); see also Cine 42nd St., 709 F.2d at 1048 (noting that "allowing tangential attacks on the [protected public entity's] activities through suits against the third parties [cooperating with it] would effectively block the efforts of the [protected body]").

24

at 373 (granting Noerr-Pennington immunity to company's effort to persuade city to adopt ordinance, even though ordinance would exclude company's competitor); Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 510 (1988) ("Petitioner, and others . . . can, with full antitrust immunity, engage in concerted efforts to influence those governments through direct lobbying, publicity campaigns, and other traditional avenues of political expression."); California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510-11 (1972) (extending Noerr-Pennington immunity to court litigation).

There are few exceptions to the application of Noerr-Pennington immunity. The Noerr court warned that neither the subjective intent of the defendant nor the "unethical character of the conduct involved" is relevant to the application of immunity. See, e.g., Prof'l Real Estate Investors, 508 U.S. 49, 60-61 (1993); Pennington, 381 U.S. at 670 ("Noerr shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose."); BusTop Shelters, Inc. v. Convenience & Safety Corp., 521 F. Supp. 989, 995 (S.D.N.Y. 1981). Thus, Defendants are entitled to Noerr-Pennington protection even if they pressured government officials, lied to the government about the merits of Doron's simulator, or otherwise drew the public transit authorities into their scheme as "co-conspirators," as long as their conduct was part of a good faith campaign aimed as securing government action. See, e.g., Omni Outdoor, 499 U.S. at 382-83; Metro Cable Co. v. CATV of Rockford, Inc., 516 F.2d 220, 229-31 (7th Cir. 1975); N.Y. Jets, 2005 WL 2649330, at *6; BusTop Shelters, 521 F. Supp. at 995-96.

Similarly, in Omni Outdoor Advertising, the Supreme Court made clear that there is no conspiracy exception to the Noerr-Pennington doctrine. 499 U.S. at 383. Thus, even if

25

Defendants did conspire among themselves and with other public transit authorities "to employ

government action as a means of stifling competition" by Doron, <u>Noerr-Pennington</u> immunity

still applies. <u>Id.</u> at 382.

Doron urges the Court to find that <u>Noerr-Pennington</u> immunity does not shield

Defendants in this case because Defendants dealt with public transit authorities acting in a

proprietary, rather than a policymaking, capacity. In support of this position, Doron cites

extensively to <u>George E. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.</u>, a First Circuit case

from 1970.[15] <u>Whitten</u> held that <u>Noerr-Pennington</u> immunity does not extend to efforts by private

---

[15] While Doron cites other cases, none of them are directly applicable to this case. Some of these cases are distinguishable on the facts of this case, as they involved private defendants who rigged or influenced the bidding process through conduct that was itself illegal. <u>See, e.g.</u>, <u>F. Buddig Contracting, Inc. v. Seawright</u>, 595 F. Supp. 422, 425-26 (N.D. Ohio 1984) (finding liability where defendants conspired to rig the bidding process); <u>Richard Hoffman Corp. v. Integrated Bldg. Sys., Inc.</u>, 581 F. Supp. 367, 374 (N.D. Ill 1984) (finding that plaintiff adequately alleged anticompetitive conduct where private firm had prepared bid specifications and written in its own product, thereby denying the public agency independent judgment in its choice of product).

Other cases are simply not relevant. For example, while the court in <u>Fremaux v. Bd. of Com'r of Hosp. Serv. Dist. No. 3</u>, did, as Plaintiff claims, deny <u>Noerr-Pennington</u> immunity to a doctor who used the competitive bidding process to obtain an exclusive contract with a state hospital, <u>see</u> 1997-1 Trade Cas. ¶ 71,852, 1997 WL 159483, at *5 (E.D. La. 1997), <u>Fremaux</u> appears limited to the hospital context, and was implicitly overruled by the Fifth Circuit in <u>Surgical Care Ctr. of Hammond, L.C. v. Hosp. Service Dist. No. 1</u>, 153 F.3d 220, 225 (5th Cir. 1998), which held that the private defendant, a private medical center, was entitled to the same immunity as the state hospital defendant. In <u>Surgical Care Center of Hammond</u>, the Fifth Circuit based its grant of immunity to the private defendant on <u>Parker v. Brown</u> and its progeny, not on the <u>Noerr-Pennington</u> doctrine, but the decision appears to have the same effect as if <u>Noerr-Pennington</u> immunity was applied to the private defendants. <u>See Surgical Care Ctr. of Hammond</u>, 153 F.3d at 225. It is also important to note that, after denying <u>Noerr-Pennington</u> immunity to the defendant doctor, the trial court in <u>Fremaux</u> found nothing anticompetitive about the doctor's conduct and therefore granted defendant's motion to dismiss. <u>See Fremaux</u>, 1997 WL 159483, at *5-6 ("[P]laintiff's unsuccessful direct participation in a competitive process can not be converted into an antitrust injury . . . .").

At oral argument, Doron also puts significant emphasis on <u>Indian Head, Inc. v. Allied Tube & Conduit Corp.</u>, 817 F.2d 938 (2d Cir. 1987). (Oral Argument Tr. 39-40). Its reliance on this case is misinformed, however, as <u>Indian Head</u> merely says that <u>Noerr-Pennington</u> immunity does not extend to lobbying of a private organization acting as a "quasi-legislative" body. <u>See</u> 817 F.2d at 943. The Court's concern in that case was the fact that the rule-making body was not actually a public entity. <u>Id.</u> That is not the case here.

business to sell products to public officials acting under competitive bidding statutes. 424 U.S. 25, 33 (1970). Similar to this case, the Whitten defendants had lobbied public agents–architects drafting specifications for public swimming pools–to include technical descriptions that fit only its swimming pool designs, and not its competitors, in the bid specifications. See id. at 28. Relying on the Supreme Court's decision in Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690 (1962), which held that a private firm acting as administrator of a public rationing program was not entitled to Noerr-Pennington immunity where it had used its discretionary power to exclude a competing ore processor from the market, the Whitten court found an exception to Noerr-Pennington immunity since the government was acting a proprietary capacity. See id. at 33.

There are a number of problems with Doron's reliance on Whitten. First, the Whitten facts are different from the facts of this case. In this case, each public transit authority controlled its own RFPs. In Whitten, on the other hand, "the initial responsibility for recommending specifications [had] been entrusted to a hired professional," and all selling efforts were "directed at that professional," so there was a much stronger case that the decisional autonomy of the single public consumer had been corrupted by the defendants' conduct. See id. at 29; see also Richard Hoffman Corp., 581 F. Supp. at 374 (finding that plaintiff adequately alleged anticompetitive conduct where private firm had prepared bid specifications and written in its own product, thereby denying the public agency independent judgment in its choice of product).

Second, Whitten has not withstood the test of time. Later cases expressly reject the idea of a commercial exception to Noerr-Pennington. See A Fisherman's Best, Inc. v.

27

Recreational Fishing Alliance, 310 F.3d 183, 194 (4th Cir. 2002); Greenwood Utilities Comm'n v. Miss. Power Co., 751 F.2d 1484, 1505 (5th Cir. 1985) (refusing to recognize a commercial exception to Noerr-Pennington immunity, since it is difficult to determine when a government is acting in a regulatory capacity as opposed to engaging in purely commercial conduct); In re Airport Car Rental Antitrust Litig., 693 F.2d 84, 87 (9th Cir. 1982); Santana Prods. Inc. v. Bobrick Washroom Equip., Inc., 249 F. Supp. 2d 463, 487-91 (M.D. Pa. 2003) (expressly holding, under facts similar to those here, that "[t]here is no 'commercial' exception to Noerr/Pennington immunity" and that the proper inquiry is whether the anticompetitive injury was caused by government action or by the private defendant), rev'd on other grounds, 401 F.3d 123 (3d Cir. 2005); Sea Air Shuttle Corp. v. V.I. Port Auth., 782 F. Supp. 1070, 1076 (D.V.I. 1991); Bright v. Ogden City, 635 F. Supp. 31, 35 (D. Utah 1985) (same). In fact, some courts go so far as to suggest that Whitten is no longer good law. See, e.g., In re Airport Car Rental Antitrust Litig., 693 F.2d at 87 ("It is possible that California Motor Transport implicitly overruled . . . Whitten."), cert. denied, 462 U.S. 1133 (1983); BusTop Shelters, 521 F. Supp. at 996 ("Whitten . . . ha[s] been disapproved in this circuit, as implicitly overruled or weakened by California Motor Transport." (citing to Reaemco, Inc. v. Alleghany Airlines, 496 F. Supp. 546, 556 n.6 (S.D.N.Y. 1980)).

The courts of this District[16] have unanimously held that Noerr-Pennington immunity protects all lobbying and solicitation of public entities, including lobbying for

---

[16]    The Second Circuit has not yet ruled on this issue. See Triple M Roofing, 753 F.2d at 248 n.4.

28

commercial gain, as long as the defendants' petition was not "sham conduct."[17] See N.Y. Jets, 2005 WL 2649330, at *6; U.S. Football League v. Nat'l Football League, 634 F. Supp. 1155, 1179-80 (S.D.N.Y. 1986); BusTop Shelters, 521 F. Supp. at 995-96; see also Interstate Props., 586 F. Supp. at 1163 (stating that, absent allegations of "bribery, fraud or unethical procedures by [defendant] that corrupted the [public official] and robbed or attempted to rob him of independent judgment," Noerr-Pennington immunity applies). The term "sham conduct" refers to conduct that while "ostensibly directed toward influencing governmental action, is a mere sham to cover . . . an attempt to interfere directly" with the plaintiff's business relationships. Noerr, 365 U.S. at 144. Thus, in this district, the only conduct excluded from Noerr-Pennington coverage is conduct that never genuinely intended to influence government action. Despite Doron's urgings to the contrary, then, Defendants are protected by Noerr-Pennington despite the proprietary nature of the alleged conspiracy.

Taking all factual allegations in Doron's amended complaint as true, as the Court must on a motion to dismiss, see LaBounty v. Adler, 933 F.2d 121, 123 (2d Cir. 1991), Defendants' conduct does not fall within the sham exception to Noerr-Pennington immunity. Even Doron cannot dispute (indeed it is implicit in its allegations) that Defendants' lobbying

---

[17] Supreme Court precedent has extremely limited the sham exception, holding that the exception applies only where a defendant's activities "are *not genuinely aimed at procuring favorable government action at all*," Omni Outdoor, 499 U.S. at 380 (emphasis added), but really mask an attempt to interfere directly with the business relationships of a competitor." See Prof'l Real Estate Investors, 508 U.S. at 60-61. The Court gives as a classic example a defendant who files "frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay," Omni Outdoor, 499 U.S. at 380, or engages in "objectively baseless" litigation against a competitor. See Prof'l Real Estate Investors, 508 U.S. at 60-61 (1993); California Motor Transp., 404 U.S. at 512.

29

efforts were genuinely aimed at procuring government action, in the form of bid specifications tailored to the FAAC simulator. Because Defendants' lobbying efforts were not a sham, Noerr-Pennington immunity applies. On this basis alone, Doron's federal antitrust claims must be dismissed.

C. Local Government Antitrust Act

In light of the Court's findings that Doron fails to state an antitrust claim and that, even if Doron adequately alleged a Sherman Act claim, the Parker and Noerr-Pennington doctrines would shield Defendants' conduct from liability, there is no need to discuss the applicability of the Local Government Antitrust Act to this case.[18]

VI. DONNELLY ACT CLAIM

The Donnelly Act, N.Y. Gen. Bus. Law § 340, was "modelled on the Federal Sherman Act of 1890," and therefore "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result." X.L.O. Concrete Corp. v. Rivergate Corp., 83 N.Y.2d 513, 528 (1994) (internal quotation marks omitted). Doron has not argued that any special state policy or any provision unique to the Donnelly Act requires a different result.

---

[18] The Local Government Antitrust Act ("LGAA") provides that "[n]o damages, interest on damages, costs or attorney's fees may be recovered from any local government" for violations of the federal antitrust laws. 15 U.S.C. § 15. The term "local government" includes special function governmental units established by state law. 15 U.S.C. § 34. As a public benefit corporation of the state of New York, operating for the special purpose of maintaining a commuter transportation system within the geographic area of New York City, NYCTA is a "special purpose governmental unit," and is therefore protected by the LGAA. See, e.g., Capital Freight Servs. Inc. v. Trailer Marine Transp., 704 F. Supp. 1190 (S.D.N.Y. 1989) (finding the Puerto Rico Maritime Shipping Authority, a public corporation created for the express purpose of maintaining a maritime transportation system for the people of Puerto Rico, was a "public function governmental unit" under the LGAA). Therefore, even if the Court found that Defendants had violated the Sherman Act, under no circumstances could Doron recover monetary damages from NYCTA for its violation of these laws.

30

Therefore, the Court finds that Doron's failure to adequately allege antitrust injury, restraint on trade, or monopolization through anticompetitive behavior is just as fatal to its Donnelly Act claim as it is to its Sherman Act claims. Accordingly, Doron's claim alleging violations of New York's Donnelly Act is DISMISSED.

VII. REMAINING STATE LAW CLAIMS

The Court declines to exercise supplemental jurisdiction over Doron's remaining state law claims. See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction."). Thus, the Court need not determine at this time whether those claims withstand Defendants' motion to dismiss. Accordingly, the state law claims are dismissed, without prejudice to renewal in the proper state court.

CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss for failure to state a claim are GRANTED and Doron's amended complaint is hereby DISMISSED in its entirety. Doron's antitrust claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Donnelly Act, N.Y. Gen. Bus. L. § 340, are dismissed with prejudice. Doron's remaining state law claims are dismissed without prejudice to refiling in the proper state court. The Clerk of the Court is directed to enter judgment and close out this case.

Dated: New York, New York
       March 23, 2006

SO ORDERED

PAUL A. CROTTY
United States District Judge

31